IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| THE UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Civil Case No. _____ |
| NORFOLK SOUTHERN RAILWAY COMPANY, | |
| and | |
| NORFOLK SOUTHERN CORPORATION, | |
| Defendants. | |

## **COMPLAINT**

Plaintiff, the United States of America, by authority of the Attorney General of the United States, acting at the request and on behalf of the Administrator of the United States Environmental Protection Agency ("EPA"), alleges as follows:

INTRODUCTION

1.  On February 3, 2023, a train carrying hazardous materials[1] derailed in East Palestine, Ohio. The derailment caused dozens of rail cars to collide into one another and fall over. Fire broke out and lasted for days. Residents of the town had to be evacuated from their homes. As a result of this incident, hazardous materials vented into the air and spilled onto the

---

[1] For purposes of the Introduction and General Allegations in this complaint, the term "hazardous materials" includes hazardous substances, pollutants, contaminants, and/or oil within the meaning and coverage of the statutes at issue.

ground. These substances contaminated local waterways and flowed miles downstream. EPA, along with other agencies, responded within hours of the incident to ensure the safety of public health and the environment. Plaintiff United States of America asks this Court to hold Defendants accountable for unlawfully polluting the nation's waterways and to ensure it pays the full cost of the environmental cleanup.

2.  This is a civil action brought by the United States against Norfolk Southern Railway Company ("NS Railway") and Norfolk Southern Corporation ("NS Corporation") (collectively "Norfolk Southern" or "Defendants"), seeking injunctive relief, cost recovery, and civil penalties, as specified below in the Claims for Relief. This action is brought under:

    a.  Section 309 of the Clean Water Act ("CWA"), 33 U.S.C. § 1319, for Defendants' discharges of pollutants into waters of the United States in violation of Section 301 of the CWA, 33 U.S.C. § 1311;

    b.  Section 311 of the CWA, 33 U.S.C. § 1321, for the discharge of oil or hazardous substances into waters of the United States in violation of 33 U.S.C. § 1321(b)(3); and

    c.  Section 107 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607, for the recovery of response costs.

JURISDICTION, VENUE, AND AUTHORITY

3.  This Court has jurisdiction over the subject matter of this action pursuant to 33 U.S.C. § 1319(b), 33 U.S.C. § 1321(b)(7)(E), 42 U.S.C. § 9613(b), and 28 U.S.C. §§ 1331, 1345, and 1355.

4.      Venue is proper in this district pursuant to 33 U.S.C. § 1319(b), 33 U.S.C. § 1321(b)(7)(E), and 42 U.S.C. § 9613(b) because Defendants do business in this district and the events that gave rise to the claims occurred in this district.

5.      This action is properly filed in the Eastern Division of this district pursuant to Local Rule 3.8(a) because the events that gave rise to the claims occurred in Columbiana County.

## THE PARTIES

6.      Plaintiff, the United States of America, is acting at the request and on behalf of the Administrator of EPA.

7.      NS Railway is a Virginia corporation with its headquarters in Atlanta, Georgia.

8.      NS Railway is a wholly-owned subsidiary of NS Corporation, which holds all the stock of NS Railway.

9.      NS Corporation is a Virginia corporation with its headquarters in Atlanta, Georgia.

10.     Each Defendant is a "person" within the meaning of the CWA and CERCLA. 33 U.S.C. § 1362(5); 33 U.S.C. § 1321(a)(7); and 42 U.S.C. § 9601(21).

## GENERAL ALLEGATIONS

A.  Norfolk Southern Corporation Controls the Operations of Norfolk Southern Railway Company

11.     NS Corporation plays a controlling role in decisions regarding the operations of NS Railway, which operates a freight railroad over 35,000 miles of track in 22 states, transporting all manner of materials and goods, including coal, intermodal containers, agricultural products, chemicals, metals, and automotive products.

12.     NS Railway is a common carrier that accepts hazardous substances for transport.

13.     Defendants operated Norfolk Southern Train 32N and its railcars at all times relevant to this complaint.

14.     Defendants owned the locomotive and some of the railcars on Norfolk Southern Train 32N at all times relevant to this complaint.

15.     Both Defendants operate out of the same corporate headquarters, and the President, Vice President, Chief Financial Officer, and Treasurer for NS Railway hold the same or very similar positions with NS Corporation.

16.     The United States Surface Transportation Board requires railroad companies operating within the United States to submit an annual report ("Annual Report").

17.     The 2021 Annual Report states that all of NS Corporation's subsidiaries were under the common control of NS Corporation, and that rail operations are coordinated at the holding company level by NS Corporation's Chief Operating Officer.

18.     The 2021 Annual Report identifies NS Railway as the principal subsidiary of NS Corporation.

19.     Clairborne L. Moore, the Vice President and Controller for NS Corporation, signed the 2021 Annual Report.

20.     In affidavits filed in federal ligation:

    a.  Jason Zampi, a Vice President and Controller for NS Corporation, stated that the annual reports submitted to the Surface Transportation Board are prepared by personnel of NS Corporation with knowledge of and a business duty to prepare the information contained in the annual reports.

b. Roger Petersen, NS Corporation's General Counsel – Litigation, stated that NS Corporation "directs, controls, oversees, and handles litigation involving it and its wholly-owned subsidiaries, including [NS Railway]."

*See Coker v. Norfolk Southern Corporation*, *et al*., Civil Action No. 2:18-cv-1364 (S.D. Ala 2018) (Dk. No. 34-1, 34-2).

21.     Approximately eighty percent of the compensation for NS Corporation's executives are based on performance metrics.

22.     These performance metrics focus on performance measures such as operating ratio and operating income for its subsidiaries. Operating ratio looks at operating expenses as a percentage of revenue. Operating income looks at operating revenue less operating expenses.

23.     These financial metrics were selected to motivate and reward NS Corporation's executives for increasing revenue, improving operating efficiency, and reducing expenses of its railroad subsidiaries.

24.     NS Corporation's executives achieve these metrics by controlling subsidiaries' operations, which includes the operations of NS Railway.

25.     Over the past four years, annual reports show a stark contrast between the increases in operating income and the drop in railroad operating costs.

26.     The drop in operating costs includes reductions in spending to repair, service, and maintain locomotives and freight cars, perform train inspections, and pay engine crews and train crews.

27.     In 2019, prior to retiring, Mike Wheeler, the Executive Vice President and Chief Operating Officer for NS Corporation, issued *Operating Rules* governing the operations of all of NS Corporation's railroad subsidiaries.

28.     These *Operating Rules* cover almost every aspect of NS Railway's operations, including train inspections, use of defective equipment detectors, train movement, braking, and positive train control.

29.     NS Corporation also issues *Railroad Special Hazmat Instructions* that govern the transportation and handling of hazardous materials by NS Railway's employees.

30.     NS Corporation requires each NS Railway employee who inspects or transports hazardous materials by rail to have a copy of and comply with the *Railroad Special Hazmat Instructions*.

31.     NS Corporation offers training to each employee who directly transports hazardous materials.

32.     The legal department for NS Corporation often files public comments and other pleadings relating to railway operations with the United States Department of Transportation and Federal Railroad Administration on behalf of NS Railway.

33.     Often affidavits filed in support of these submissions come from NS Corporation's employees.

34.     For example, Thomas W. Schnautz submitted a Verified Statement concerning train crew size safety requirements in December 2022. NS Corporation's website identifies Mr. Schnautz as the "Vice President – Advance Train Control," and an April 2019 press release states that Mr. Schnautz reports to NS Corporation's Chief Operating Officer.[2]

35.     In April 2021, the legal department of NS Corporation, on behalf of NS Railway, submitted to the Federal Railroad Administration supplemental data and a PowerPoint presentation discussing the findings of a track inspection pilot program.

---

[2] http://www.nscorp.com/content/nscorp/en/news/norfolk-southern-appoints-schnautz-and-boyle-as-vice-presidents-.html. Last visited on March 29, 2023.

36.     The submission was on NS Corporation letterhead and NS Corporation was the only corporate name on the PowerPoint presentation.

B.  The Norfolk Southern Train Derailment

37.     On February 3, 2023, Norfolk Southern Train 32N ("freight train") derailed in East Palestine, Ohio.

38.     Thirty-eight rail cars derailed. At least eleven of those rail cars were carrying hazardous materials.

39.     The hazardous materials contained in these cars included vinyl chloride, ethylene glycol monobutyl ether, ethylhexyl acrylate, butyl acrylate, isobutylene, and benzene residue.

40.     Exposure to these hazardous materials at sufficiently high levels has been associated variously with an increased risk of cancer; risks to fetal development; damage to organs like the liver, kidneys, lungs, and skin; and other health conditions.

41.     Vinyl chloride, butyl acrylate, and benzene are "hazardous substances" within the meaning of CERCLA Section 101, 42 U.S.C. § 9601(14).

42.     In addition, five of the rail cars that derailed were carrying oil, another car contained fuel additives, and an additional empty car contained liquified petroleum gas residue.

43.     The derailment caused some of the derailed rail cars to be breached and resulted in the release of hazardous materials into the environment, including the soil and nearby waterways.

44.     The derailment also caused some of the derailed cars to catch fire.

45.     Norfolk Southern produced the below photograph showing the derailed rail cars and describing their contents:



46.     The East Palestine Train Derailment Site (the "Site") consists of the extent of contamination resulting from the train derailment, fire, and response activities described below. Exhibit A to the Complaint generally depicts the Site features and surrounding areas.

C.  The Response to the Derailment

47.     EPA mobilized to the Site with the EPA Superfund Technical Assessment and Response Team within hours of the February 3, 2023 derailment.

48.     Other federal, state, and local agencies were also mobilized to the Site.

49.     On February 4, 2023, residents living within a one-mile radius of the Site were evacuated.

50.     The fire resulting from the derailment continued to burn until February 5, 2023.

51.     Firefighting efforts required the use of firefighting materials.

52.     Combustion of the hazardous materials and railcars released hazardous materials into the environment, including air, soil, groundwater, and waterways.

53.     Hazardous materials from the Site may have also been discharged into waterways from stormwater infrastructure at the Site and a ditch south of the Site.

54.     On February 5, 2023, monitoring indicated rising temperatures in a tank car containing vinyl chloride.

55.     Norfolk Southern vented and burned the contents of five rail cars containing vinyl chloride in a flare trench on February 6, 2023, in order to prevent an explosion.

56.     Prior to the venting and burning, the evacuation area was increased to a one-mile by two-mile area based on plume modeling conducted by the Interagency Modeling and Atmospheric Assessment Center and the Ohio National Guard 52nd Civil Support Team.

57.     EPA determined that conditions at the Site posed an imminent and substantial threat to human health and the environment, and on February 21, 2023, issued a Unilateral Administrative Order under CERCLA Section 106, 42 U.S.C. § 9606.

58.     EPA's Unilateral Administrative Order required NS Railway to take a number of actions, including:

- develop and implement an air monitoring and sampling plan for indoor air in occupied structures and around the Site;

- develop and implement a plan for the identification and delineation of the extent of contamination in surface and subsurface soils, surface waters and sediments, groundwater, and drinking water sources;

- develop and implement a plan for the containment and remediation of contaminated surface and sub-surface soils, surface waters and sediments, and groundwater (including private, municipal, and agricultural wells);

- remove, secure, stage, consolidate, package, transport, and dispose of identified hazardous substances, pollutants, and contaminants at EPA-approved disposal facilities in accordance with EPA's Off-Site Rule, 40 C.F.R. § 300.440; and

- take any response action to address any release or threatened release that EPA determines may pose an imminent and substantial endangerment to the public health or the environment.

59.     EPA continues to conduct soil sampling, air sampling, and air monitoring at and around the Site. Air sampling involves collecting an air sample over a period of time, which is then sent to a laboratory for analysis to identify and quantify specific compounds. Air monitoring uses electronic devices to provide real-time readings of airborne contaminants.

60.     EPA provides monitoring data to the public, and continues to provide information to the community about the ongoing cleanup efforts.

61.     Some of those responding to the derailment observed chemical slurries and sheen along Sulphur Run and Leslie Run and began sampling and containment activities from the Site along impacted waterways to the Ohio River.

62.     The impacted waterways are the ditch north of the railway, which is an Unnamed Tributary to Sulphur Run ("Unnamed Tributary"), Sulphur Run, Leslie Run, Bull Creek, the North Fork of Little Beaver Creek, Little Beaver Creek, and the Ohio River.

63.     EPA continues to oversee work by Defendants at the Site, including oversight of the removal of contaminated materials from the Site.

D.  Releases of Hazardous Materials from the Site

64.     The derailment caused some of the derailed cars, including cars containing hazardous materials, to be breached and the contents of the rail cars to be released into soil at and adjacent to the Site, the Unnamed Tributary, local waterways, and other areas.

65.     As a result of the derailment, subsequent fire, and firefighting efforts, hazardous materials, including but not limited to vinyl chloride, naphthalene, petroleum, butyl acrylate, ethylhexyl acrylate, and ethylene glycol monobutyl ether, reached the air, soil, and/or waterways.

66.     Naphthalene, which is classified as a hazardous substance under the CWA, and other petroleum hydrocarbons were detected in sampling in Sulphur Run and Leslie Run.

67.     Run-off from firefighting efforts resulted in additional contaminants and pollutants entering the soil, the Unnamed Tributary, local waterways, and other areas.

68.     The venting and burning of the rail cars containing vinyl chloride also caused the release of hazardous materials into the environment, including into the air, soil, groundwater, and nearby waterways.

69.     Ongoing sampling, analysis, and monitoring, as well as additional cleanup efforts, are likely to detect additional chemical substances that were created during the mixing and burning of substances released from the rail cars.

70.     The hazardous materials from the derailed cars, firefighting efforts, and hazardous materials created by the mixing and burning of the contents from the rail cars entered Sulphur Run, Leslie Run, Bull Creek, the North Fork of the Little Beaver Creek, Little Beaver Creek, and the Ohio River via discharge to the Unnamed Tributary, discharge to Sulphur Run, and/or by other means.

71.     The Ohio Department of Natural Resources has reported that thousands of aquatic animals were killed in the five-mile span of waterway from the Site to where Bull Creek flows into the North Fork of Little Beaver Creek as a result of the release of contaminants into the water.

72.     The map attached as Exhibit B to this Complaint depicts the flow path from the Unnamed Tributary to the Ohio River.

E.   Waters of the United States

73.     The Unnamed Tributary is a tributary to Sulphur Run.

74.     The Unnamed Tributary originates at State Line Lake in Darlington, Pennsylvania and flows west into Ohio.

75.     Based on drainage area flow modeling, the drainage area for the Unnamed Tributary to Sulphur Run is 1.13 square miles.

76.     Based on drainage area flow modeling, the Unnamed Tributary is approximately 13 to 16 feet wide and is approximately one foot deep upstream of its confluence with Sulphur Run.

77.     Photographs over a period of years show standing water in the Unnamed Tributary.

78.     The Unnamed Tributary typically flows year-round or has continuous flow at least seasonally.

79.     The Unnamed Tributary is a relatively permanent, standing or continuously flowing body of water.

80.     The Unnamed Tributary empties into Sulphur Run.

12

81.     The Unnamed Tributary has a significant nexus to the North Fork Little Beaver Creek, Little Beaver Creek, and the Ohio River.

82.     Sulphur Run flows through residential and commercial areas of East Palestine, Ohio.

83.     Based on drainage area flow modeling, Sulphur Run between the Norfolk Southern railroad crossing and Leslie Run ranges between 18 to 25 feet wide and is approximately 1.6 feet deep just upstream of its confluence with Leslie Run.

84.     Sulphur Run typically flows year-round or has continuous flow at least seasonally.

85.     Sulphur Run is a relatively permanent, standing or continuously flowing body of water.

86.     Satellite imagery and other photographs over a period of years show Sulphur Run has a bed and bank and standing or flowing water.

87.     Portions of Sulphur Run have been enclosed.

88.     Sulphur Run flows into Leslie Run.

89.     Sulphur Run has a significant nexus to the North Fork Little Beaver Creek, Little Beaver Creek, and the Ohio River.

90.     Based on drainage area flow modeling, Leslie Run has a drainage area of approximately 14.6 square miles, and the width of Leslie Run ranges from 31 to 48 feet, and it is approximately 2.4 feet deep.

91.     Portions of Leslie Run have been channelized and straightened over the years.

92.     Portions of Leslie Run contain a floodplain.

93.    Satellite imagery and other photographs over a period of years show a bed and bank and standing or flowing water in Leslie Run.

94.    United States Geological Survey maps from as far back as 1937 depict Leslie Run.

95.    Aerial photographs from as far back as 1952 depict Leslie Run.

96.    Leslie Run typically flows year-round or has continuous flow at least seasonally.

97.    Leslie Run is a relatively permanent, standing or continuously flowing body of water.

98.    Leslie Run flows for approximately three miles from its confluence with Sulphur Run until it flows into Bull Creek.

99.    Leslie Run has a significant nexus to the North Fork Little Beaver Creek, Little Beaver Creek, and the Ohio River.

100.    The relevant reach of Bull Creek is .85 mile from Leslie Run until it flows to the North Fork Little Beaver Creek.

101.    Photographs and images over a period of years show flowing water in Bull Creek.

102.    Bull Creek typically flows year-round or has continuous flow at least seasonally.

103.    Bull Creek is a relatively permanent, standing or continuously flowing body of water.

104.    Bull Creek empties into the North Fork Little Beaver Creek.

105.    Bull Creek has a significant nexus to the North Fork Little Beaver Creek, Little Beaver Creek, and the Ohio River.

106.    North Fork Little Beaver Creek has been designated as a navigable water by the Pittsburgh District Army Corps of Engineers.

107.    North Fork Little Beaver Creek was recognized by the State of Ohio as an impaired water for 2022 under 33 U.S.C. § 1313(d).

108.    North Fork Little Beaver Creek typically flows year-round or has continuous flow at least seasonally.

109.    North Fork Little Beaver Creek is a relatively permanent, standing or continuously flowing body of water.

110.    North Fork Little Beaver Creek flows into the Little Beaver Creek.

111.    North Fork Little Beaver Creek has a significant nexus to the Ohio River and Little Beaver Creek.

112.    The North Fork Little Beaver Creek is a traditional navigable waterway.

113.    Little Beaver Creek has been designated as a navigable water by the Pittsburgh District Army Corps of Engineers.

114.    Aerial photographs depict surface water in Little Beaver Creek.

115.    Little Beaver Creek typically flows year-round or has continuous flow at least seasonally.

116.    Little Beaver Creek is a relatively permanent, standing or continuously flowing body of water.

117.    Little Beaver Creek supports 63 species of fish, 49 mammal species, 140 types of birds, and 46 species of reptiles and amphibians.

118.    Little Beaver Creek supports the largest population of the endangered Hellbender salamanders in the State of Ohio.

119.    Little Beaver Creek is used for kayaking, paddling, fishing, and other forms of recreation.

120.  Little Beaver Creek flows into the Ohio River.

121.  Based on drainage area flow modeling, Little Beaver Creek extends 15.7 miles upstream from its confluence with the Ohio River.

122.  Little Beaver Creek has a significant nexus to the Ohio River.

123.  Little Beaver Creek is a traditional navigable waterway.

124.  The Ohio River has been designated as a navigable water by the Pittsburgh District Army Corps of Engineers.

125.  The Ohio River is a navigable river used for interstate commerce.

126.  The Ohio River is a traditional navigable waterway.

## STATUTORY AND REGULATORY BACKGROUND

A.  The Clean Water Act

1)  Prohibition of Unpermitted Discharges of Pollutants

127.  The CWA is a comprehensive statute designed "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

128.  Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the "discharge of any pollutant" by any person except in compliance with a permit issued by EPA or an authorized state.

129.  "Discharge of a pollutant" means "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12).

130.  "Pollutant" includes solid waste, chemical wastes, wrecked or discarded equipment, and industrial waste discharged into water. 33 U.S.C. § 1362(6).

131.  "Navigable waters" means the "waters of the United States." 33 U.S.C. § 1362(7).

132.     The term "waters of the United States" is defined by regulation. From the time of the discharge until March 20, 2023, the definition at 40 C.F.R. § 230.3(s) (1986) applied.

133.     Under 40 C.F.R. § 230.3(s) (1986), "waters of the United States" included:

1.  All waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide;

2.  All interstate waters including interstate wetlands;
    …
5.  Tributaries of waters identified in paragraphs (1) through (4) of this section.

134.     On March 20, 2023, a new regulatory definition of waters of the United States went into effect (the "2023 rule").

135.     Under the 2023 rule, "waters of the United States" includes:

(a)(1) traditional navigable waters, the territorial seas, and interstate waters;
…
(a)(3) tributaries to traditional navigable waters, the territorial seas, interstate waters;
…
(a)(5) intrastate lakes and ponds, streams, or wetlands not identified in paragraphs (a)(1) through (4) that meet either the relatively permanent standard or the significant nexus standard.

88 Fed. Reg. 3004, 3019 (Jan. 18, 2023) (to be codified at 40 C.F.R. § 120.2).

136.     The discharges relevant to this complaint flowed into waters of the United States under either the 1986 rule and the 2023 rule.

137.     The 2023 rule excludes ditches (including roadside ditches) excavated wholly in and draining only dry land and that do not carry a relatively permanent flow of water. 88 Fed. Reg. 3004, 3067 (Jan. 18, 2023) (to be codified at 40 C.F.R. § 120.2).

138.    "Point source" means "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit . . . [or] rolling stock," from which pollutants are or may be discharged. 33 U.S.C. § 1362(14).

139.    The definition of "person" includes a corporation. 33 U.S.C. § 1362(5).

140.    Section 309(b) of the CWA, 33 U.S.C. § 1319(b), authorizes the Administrator of EPA to commence a civil action for appropriate relief, including a permanent or temporary injunction, when any person violates Section 301 of the CWA, 33 U.S.C. § 1311.

141.    Any person who violates 33 U.S.C. § 1311 is liable for civil penalties not to exceed $64,618 per day for each violation that occurred after November 2, 2015. 33 U.S.C. § 1319(d); 40 C.F.R. § 19.4.

2)    Oil and Hazardous Substances Liability

142.    Section 311 of the Clean Water Act prohibits the discharge of oil or hazardous substances into or upon the navigable waters of the United States in such quantities as may be harmful as determined by the President. 33 U.S.C. § 1321(b)(3).

143.    For oil, the quantities determined to be harmful are those that (a) violate applicable water quality standards; or (b) cause a film or sheen upon or discoloration of the surface of the water or adjoining shorelines or cause a sludge or emulsion to be deposited beneath the surface of the water or upon adjoining shorelines. 40 C.F.R. § 110.3.

144.    For hazardous substances, the quantities determined to be harmful are those that are in "reportable quantities." 40 C.F.R. § 117.1(a).

145.    For the purposes of Section 311, "oil" means "oil of any kind or in any form, including, but not limited to, petroleum, fuel oil, sludge, oil refuse, and oil mixed with wastes other than dredged spoil." 33 U.S.C. § 1321(a)(1).

146.    For the purposes of Section 311, "hazardous substance" means any substance designated pursuant to 33 U.S.C. § 1321(b)(2) and listed in EPA's regulations at 40 C.F.R. Part 116. 33 U.S.C. § 1321(a)(14).

147.    For the purposes of Section 311, "discharge" includes, but is not limited to "any spilling, leaking, pumping, pouring, emitting, emptying, or dumping" except as authorized by a permit. 33 U.S.C. § 1321(a)(2).

148.    For the purposes of Section 311, "owner or operator" includes "any person owning or operating such onshore facility." 33 U.S.C. § 1321(a)(6).

149.    For the purposes of Section 311, "person" includes a corporation. 33 U.S.C. § 1321(a)(7).

150.    For the purposes of Section 311, "onshore facility" means "any facility (including, but not limited to, motor vehicles and rolling stock) of any kind located in, on, or under, any land within the United States other than submerged land." 33 U.S.C. § 1321(a)(10).

151.    For the purposes of Section 311, "barrel" means 42 United States gallons at 60 degrees Fahrenheit. 33 U.S.C. § 1321(a)(13).

152.    Any person who is the owner, operator, or person in charge of any onshore facility from which oil or a hazardous substance is discharged in violation of 33 U.S.C. § 1321(b)(3) is subject to a civil penalty of $55,808 per day of violation or an amount up to $2,232 "per barrel of oil or unit of reportable quantity of hazardous substances discharged." 33 U.S.C. § 1321(b)(7); 40 C.F.R. § 19.4.

B.  The Comprehensive Environmental Response, Compensation, and Liability Act

153.    CERCLA governs the response to the release of hazardous substances and ensures that responsible parties pay for the costs of cleanup. 42 U.S.C. § 9601 et seq.

154.    Under CERCLA Section 107, 42 U.S.C. § 9607(a), the owner or operator of a facility or any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of, from which there is a release or threatened release, is liable for all costs of removal or remedial action incurred by the United States Government not inconsistent with the National Contingency Plan.

155.    The amounts recoverable under CERCLA Section 107 include interest on the recoverable costs. 42 U.S.C. § 9607(a).

156.    In any action for recovery of costs referred to in Section 107, "the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages." 42 U.S.C. § 9613(g)(2).

157.    "Facility" includes any structure, installation, equipment, ditch, storage container, rolling stock, or any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located. 42 U.S.C. § 9601(9).

158.    An "onshore facility" means any facility (including, but not limited to, rolling stock) of any kind located in, on, or under, any land or nonnavigable waters within the United States. 42 U.S.C. § 9601(18).

159.    "Hazardous substance" includes substances designated under the Clean Water Act, Clean Air Act, or the Solid Waste Disposal Act, and includes mixtures of hazardous substances and petroleum products. 42 U.S.C. § 9601(14).

160.    "Pollutant or contaminant" includes, but is not limited to any element, substance, compound, or mixture, which after release into the environment and upon exposure, ingestion, inhalation, or assimilation into any organism, either directly from the environment or indirectly

20

by ingestion through food chains, will or may reasonably be anticipated to cause death, disease, behavioral abnormalities, cancer, genetic mutation, physiological malfunctions (including malfunctions in reproduction) or physical deformations, in such organisms or their offspring. 42 U.S.C. § 9601(33).

161.    CERCLA Section 104, 42 U.S.C. § 9604(a), authorizes EPA to respond to the release of any pollutant or contaminant that may present an imminent and substantial danger to the public health or welfare.

162.    "Owner or operator" means, in the case of an onshore facility, any person owning or operating such facility. In the case of a hazardous substance which has been accepted for transportation by a common or contract carrier, the term "owner or operator" shall mean such common carrier or other bona fide for hire carrier acting as an independent contractor during such transportation. 42 U.S.C. § 9601(20)(A), (B).

163.    The definition of "person" includes a corporation. 42 U.S.C. § 9601(21).

164.    "Release" means any "spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment." 42 U.S.C. § 9601(22).

165.    The definition of "remove" or "removal" includes actions taken in response to the release or threat of release of hazardous substances into the environment. 42 U.S.C. § 9601(23).

166.    The definition of "remedy" or "remedial action" includes actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threat of release of hazardous substances into the environment. 42 U.S.C. § 9601(24). The definition of "respond" or "response" means remove, removal, remedy, and remedial action. 42 U.S.C. § 9601(25).

CLAIMS FOR RELIEF

<u>First Claim for Relief: Discharge of Pollutants in Violation of Clean Water Act</u>
<u>(33 U.S.C. § 1311(a))</u>

167.   Paragraphs 1-166 are realleged and incorporated here by reference.

168.   Starting on February 3, 2023, and continuing thereafter, Defendants discharged

pollutants within the meaning of 33 U.S.C. § 1362(6) into waters of the United States.

169.   The derailed rail cars are each a "point source" within the meaning of 33 U.S.C. §

1362(14).

170.   The Unnamed Tributary is a water of the United States within the meaning of 40

C.F.R. § 230.3(s)(2) (1986) as an interstate water and 40 C.F.R. § 230.3(s)(5) (1986) as a

tributary to Sulphur Run, Leslie Run, Bull Creek, the North Fork Little Beaver Creek, Little

Beaver Creek, and the Ohio River.

171.   The Unnamed Tributary is also a water of the United States under the 2023 rule as

a paragraph (a)(1) interstate water, as a paragraph (a)(3) tributary, and as a paragraph (a)(5)

tributary with relatively permanent flow and a significant nexus to the North Fork Little Beaver

Creek, Little Beaver Creek, and the Ohio River.

172.   In the alternative, the Unnamed Tributary is a "point source" within the meaning

of 33 U.S.C. § 1362(14).

173.   Sulphur Run is a water of the United States within the meaning of 40 C.F.R. §

230.3(s)(5) (1986) as a tributary to Leslie Run, Bull Creek, the North Fork Little Beaver Creek,

Little Beaver Creek, and the Ohio River.

174.   Sulphur Run is also a water of the United States under the 2023 rule as a

paragraph (a)(3) tributary, and as a paragraph (a)(5) tributary with relatively permanent flow and

a significant nexus to the North Fork Little Beaver Creek, Little Beaver Creek, and the Ohio River.

175.     Leslie Run is a water of the United States within the meaning of 40 C.F.R. § 230.3(s)(5) (1986) as a tributary to Bull Creek, the North Fork Little Beaver Creek, Little Beaver Creek, and the Ohio River.

176.     Leslie Run is also a water of the United States under the 2023 rule as a paragraph (a)(3) tributary, and as a paragraph (a)(5) tributary with relatively permanent flow and a significant nexus to the North Fork Little Beaver Creek, Little Beaver Creek, and the Ohio River.

177.     Bull Creek is a water of the United States within the meaning of 40 C.F.R. § 230.3(s)(5) (1986) as a tributary to the North Fork of Little Beaver Creek, Little Beaver Creek, and the Ohio River.

178.     Bull Creek is also a water of the United States under the 2023 rule as a paragraph (a)(3) tributary, and as a paragraph (a)(5) tributary with relatively permanent flow and a significant nexus to the North Fork Little Beaver Creek, Little Beaver Creek, and the Ohio River.

179.     The North Fork Little Beaver Creek is a water of the United States within the meaning of 40 C.F.R. § 230.3(s)(1) (1986) as a traditional navigable water.

180.     In the alternative, the North Fork Little Beaver Creek is a water of the United States within the meaning of 40 C.F.R. § 230.3(s)(5) (1986) as a tributary to Little Beaver Creek.

181.     The North Fork Little Beaver Creek is also a water of the United States under the 2023 rule as a paragraph (a)(1) traditional navigable water, as a paragraph (a)(3) tributary, and as a paragraph (a)(5) tributary with relatively permanent flow and a significant nexus to Little Beaver Creek and the Ohio River.

182.    Little Beaver Creek is a water of the United States within the meaning of 40 C.F.R. § 230.3(s)(1) (1986) as a traditional navigable water.

183.    In the alternative, Little Beaver Creek is a water of the United States within the meaning of 40 C.F.R. § 230.3(s)(5) (1986) as a tributary to the Ohio River with relatively permanent flow and a significant nexus to the Ohio River.

184.    Little Beaver Creek is also a water of the United States under the 2023 rule as a paragraph (a)(1) traditional navigable water and as a paragraph (a)(3) tributary.

185.    The Ohio River is a water of the United States within the meaning of 40 C.F.R. § 230.3(s)(1) (1986) as a traditional navigable water.

186.    The Ohio River is also a water of the United States under the 2023 waters of the United States rule as a paragraph (a)(1) traditional navigable water.

187.    Defendants discharged pollutants within the meaning of 33 U.S.C. § 1362(6) to one or more of the waters of the United States directly from derailed rail cars, via the Unnamed Tributary, or by other means.

188.    Defendants are liable for injunctive relief and civil penalties not to exceed $64,618 per day for each violation. 40 C.F.R. § 19.4.

Second Claim for Relief: Discharge of Oil and Hazardous Substances in Violation of the Clean Water Act (33 U.S.C. § 1321)

189.    Paragraphs 1-188 are realleged and here by reference.

190.    The derailed freight train and the individual rail cars comprising the train are rolling stock, and each is a "onshore facility" within the meaning of 33 U.S.C. § 1321(a)(10).

191.    NS Railway is the owner and operator of the onshore facility.

192.    NS Corporation is the operator of the onshore facility.

193.     Starting on February 3, 2023, and continuing thereafter, Defendants discharged oil within the meaning of 33 U.S.C. § 1321(a)(1) into waters of the United States.

194.     Starting on February 3, 2023, and continuing thereafter, Defendants discharged hazardous substances within the meaning of 33 U.S.C. § 1321(a)(14) into waters of the United States.

195.     Defendants discharged oil within the meaning of 33 U.S.C. § 1321(a)(1) and hazardous substances within the meaning of 33 U.S.C. § 1321(a)(14) to one or more of the waters of the United States directly from derailed rail cars, via the Unnamed Tributary, or by other means.

196.     Defendants discharged oil in a quantity determined to be harmful, within the meaning of 40 C.F.R. § 110.3.

197.     Defendants discharged hazardous substances in a quantity determined to be harmful, based on the reportable quantities in 40 C.F.R. § 117.3.

198.     The response action is ongoing and sampling may show the presence of other hazardous substances at or being discharged from the Site.

199.     Defendants were the operators of the derailed train and derailed cars, within the meaning of 33 U.S.C. § 1321(a)(6).

200.     Defendants are liable for injunctive relief and civil penalties of $55,808 per day of violation or an amount up to $2,232 per barrel of oil or unit of hazardous substances discharged. 40 C.F.R. § 19.4.

Third Claim for Relief: Cost Recovery under 42 U.S.C. § 9607(a)

201.     Paragraphs 1-166 are realleged and incorporated here by reference.

202.    The derailed freight train and the individual rail cars comprising the train are rolling stock, and each is a "facility" within the meaning of 42 U.S.C. § 9601(9).

203.    The Site, including the real property along the railway lines in East Palestine, Ohio owned by Defendants, where hazardous substances came to be located, is a "facility" within the meaning of 42 U.S.C. § 9601(9).

204.    Defendants are the "owner or operator" of a facility, within the meaning of 42 U.S.C. §§ 9601(20) and 9607(a)(1).

205.    Defendants are the "owner or operator," within the meaning of 42 U.S.C. § 9601(20), who at the time of disposal of hazardous substances owned or operated any facility at which such hazardous substances were disposed of within the meaning of 42 U.S.C. § 9607(a)(2).

206.    There were "releases," within the meaning of 42 U.S.C. § 9601(22), of "hazardous substances," within the meaning of 42 U.S.C. § 9601(14), from the facilities.

207.    The releases from the facilities caused, and will continue to cause, the United States to incur response costs within the meaning of 42 U.S.C. § 9607(a).

208.    The United States has incurred response costs that are not inconsistent with the National Contingency Plan.

209.    Defendants are liable for all of the United States' response costs that are not inconsistent with the National Contingency Plan.

PRAYER FOR RELIEF

Plaintiff United States of America respectfully requests that this Court:

A. Issue a judgment assessing civil penalties of $64,618 per day, per violation of Section 301 of the Clean Water Act, 33 U.S.C. § 1311.

B.  Issue a judgment assessing civil penalties of $55,808 per day or $2,232 per barrel of oil

or unit of hazardous substance, per violation of Section 311 of the Clean Water Act, 33

U.S.C. § 1321(b)(7).

C.  Issue a declaratory judgment that Defendants are liable for all of the United States'

CERCLA response costs that are not inconsistent with the National Contingency Plan,

pursuant to 42 U.S.C. § 9613(g)(2).

D.  Order Defendants to take such actions as may be necessary to ensure safe transport of oil

and hazardous materials, hazardous substances, pollutants, and contaminants.

E.  Order Defendants to take appropriate actions to remedy, mitigate, and offset the harm to

public health and the environment caused by the violations of the Clean Water Act

alleged above.

F.  Award the United States its costs of this action.

G.  Grant such other relief as the Court deems just and proper.

Respectfully submitted,

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice


*/s/ Lauren D. Grady*
LAUREN D. GRADY (IL: 6315393)
MATTHEW C. INDRISANO (VA: 66617)
Trial Attorneys
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611, Ben Franklin Station
Washington, DC 20044-7611
Lauren.Grady@usdoj.gov
Matthew.Indrisano@usdoj.gov

MICHELLE M. BAEPPLER
First Assistant United States Attorney
Northern District of Ohio

BRENDAN F. BARKER (IL: 6299039)
ELIZABETH A. DEUCHER (OH: 0095542)
Assistant United States Attorneys
Northern District of Ohio
801 West Superior Avenue, Suite 400
Cleveland, Ohio 44113
Phone: (216) 622-3795/3712
Fax: (216) 522-2404
Brendan.Barker@usdoj.gov
Elizabeth.Deucher@usdoj.gov

Of counsel:

NICOLE WOOD
NAEHA DIXIT
TASIA KASTANEK
US EPA Region 5
Office of Regional Counsel